The next case on the calendar is Paushok v. Ganbold et al. We have Mr. Murphy for the appellant. May it please the Court, my name is Kevin Murphy. I'm representing the appellant plaintiff in this matter. This matter is best understood first in its context, and that is it was an elaborate scheme to defraud both one of the largest Mongolian banks, Golomb Bank, of its ability to attach assets that were initially pledged to Gazprom Bank. And secondly, it was a scheme to defraud Mr. Paushok. Mr. Paushok entered into a share purchase agreement as part of a cloud of baseless criminal charges that had been entered against him. He was paid to walk away from his position as the CEO for three primary conditions. The first condition is that he would accept payment, a pittance of what the actual gold mines that he owned were worth, some $20 million versus the $2 billion that they were worth. Secondly, he was asked, he was told that he would not have any surety from the initial original transaction from 2006 against him anymore. That would be assumed by Golden East Mongolia. Look, I understand there may have been overreaching, there may have been fraud, there may have been breach of contract, but as I understand it, the one statutory claim that's still before us is whether there was a violation of the FDCPA. Is that right? That's absolutely correct, Your Honor. And the trouble was that the district court simply didn't look at what the main motivation was with respect to Paushok. What has that got to do with whether this was a consumer personal loan or something else, a commercial loan? What's critical is that Paushok is the master of the complaint. He charged that the share purchase transaction created the consumer debt. No, you can't just call it a consumer debt. That's not enough under Iqbal Twan, just because he says this was a consumer debt. That's a legal conclusion. You have to allege facts that would plausibly support this as a consumer debt. So let's just boil it down. I think you can see, you can correct me if I'm wrong, that the loan agreement and the surety agreement undoubtedly was a commercial loan, a commercial transaction, right? That's correct. All right. And that's what they're seeking now to enforce, right? They're seeking to enforce that, but they're also doing other things well beyond that, and that can only be understood in context, Your Honor. This is really the motivation here is what created the consumer debt. Gambled paid Paushok. No, the motivation doesn't matter. The motivation doesn't matter. I don't understand. Let's go back to Judge Parker and say whether or not something is a commercial or a consumer debt, why does the motivation matter? You look at the transaction, right? There are two transactions. The transaction, there is no the transaction. I know, but the later transaction, the later transaction that you try to cite, there's no new debt as a result of that transaction. What's the new debt from that transaction? There is none. There doesn't need to be under this circuit's law. This circuit says that debt can be created even if the debt is fictitious. This circuit says that debt can exist even if the contract that created potential debt no longer exists. That is Ramea against Fugger. If you have a commercial debt that they're trying to collect on, and your point is there was some fraud that took place and we really paid that off, you're saying that all of a sudden it's not a commercial debt anymore? I'm saying that. They're still trying to enforce it. Whether or not there was some fraud, that's already been litigated. You litigated that already. Now you want to relitigate whether there was fraud or something else going on under the FDCPA for something that is clearly commercial. What we understood at this time was simply that Gambold was motivated to take back what he had paid to Palschik. The idea was, and what's important about this, is that Palschik, beyond the 2006 transaction, Palschik received millions of dollars in money personally. He received it personally related to his personal liabilities, liabilities that were baseless criminal charges against him, which he understood would be dropped and were dropped. And two, that he wouldn't be harassed, and three, that he received money that was his. Now they're raising a surety as a bonus, and the critical part of this, Your Honor, is in the record of JA-21, and JA-21 paragraph 34 talks about why Gambold raised this as a bonus. Everyone was shocked. Everyone said it was fraud, and why was it fraud? It was fraud because everyone knew that the surety was defunct. It was no longer Palschik's responsibility under it. I'm sorry. I still don't understand. You conceded that the loan in the first instance, the transaction in the first instance, was commercial. Explain to me what happened that turned it into a consumer transaction. Gambold paid Palschik to get out from under Golden East Mongolia. He took over Golden. Gambold took over East Mongolia. Palschik received money in his personal capacity, $20 million. This was with the understanding that the surety would be covered by Golden East Mongolia. Golden East Mongolia then bought its own debt from Gazprom Bank with the idea of getting at the $2 billion that was sitting in the ground pursuant to those gold mines so that it could divide it up against the various participants in the scheme. And all that came out of Palschik. Aren't those arguments really barred by our case law? Because it seems to me we've been pretty clear that the FDCPA does not cover actions arising out of commercial debts, and it doesn't cover debts arising out of commercial transactions. That law is not law. It's dicta from Goldman against Cohen. It appears in footnote one of Goldman against Cohen, now superseded. Your Honor, Goldman against Cohen did not involve the consumer nature of the debt. It simply dropped as a footnote. And when it was superseded in the later case, Carlin, Carlin did not reiterate this footnote. So I don't believe that arising under is the standard. The standard is whether there's a pro tanto exchange. The consumer has to receive – A pro tanto exchange is something of value that goes to the consumer in his personal capacity. And it's from that sum from which the debt is to be collected. But it's a normal occasion in business when individuals profit personally from commercial transactions. That happens every day. The statute requires, Congress required, that it be primarily for personal purposes, which is what we've argued and which is what we pled in the complaint. I think it's probably best if I reserve the balance of my time for rebuttal as I'm facing it. All right. Thank you, Mr. Murphy. Thank you very much. We'll hear now from the appellees. Mr. Geller? Good morning, Your Honors. Mitchell J. Geller of Holland and Knight representing all of the appellees other than Torday Danvold. I'm going to cede two minutes of my time to Eric Weinert, who represents Mr. Danvold, just in case he needs it. I think that Your Honors have already kind of set the whole stage. Mr. Murphy says you have to see everything in context. This was an elaborate scheme to defraud Goldman Bank and Mr. Pauschak. And then he keeps talking about motivation, none of which has anything to do about this case. This case is whether or not the claim falls within the FDCPA. He says that actions arising out of commercial debt is now dicta. That is totally untrue. There are dozens and dozens of cases, but I don't have to refer to dozens and dozens of cases. We have the Scarola case in which Your Honor was on the panel, and it specifically said that an action arising out of a commercial debt does not fall within the FDCPA. He doesn't, by the way, even address the FDCPA. What he would like to do is, as Your Honor pointed out, he would like to relitigate his purported fraud claims under the guise of an FDCPA claim. And in fact, he has been already in the New York court system, where we have gone from the Supreme Court up to the Court of Appeals, and every single time his claims have been rejected. Everything he's alleging here has already been dealt with in the New York courts. They recognized the Russian judgment for $25 million against Mr. Pauschak, pursuant to CPLR Article 53, and he raised all of these allegations that he's raising now, he's raising again. But now let's get back to why this is not falling within the FDCPA. The language of the FDCPA, the decisions of this court, the decisions of all the other circuits, the decisions of the district court here, and his, the language of his own complaint, and more importantly, the actual documents specifically refute the possibility of an FDCPA claim. We sued, I'm sorry, Gasporn Bank and then later Bat Brothers sued to recover on the 2006 facility agreement and the 2006 guarantee that Mr. Pauschak gave. Those are the only documents that matter here. That's what we sued upon. All of a sudden he's now saying somehow a 2011 share purchase agreement of which Gasporn Bank and Bat Brothers was not even a party, somehow converts it into an FDCPA claim and somehow changes it into debt. You cannot have debt if you receive $20 million. That's pretty straightforward. It's a nonsensical claim. But let's get back to the two main documents. The surety agreement from 2006 and the guarantee. He has not cited because he cannot cite a case that says that an action arising out of a $30 million commercial debt can somehow fall within the FDCPA claim. And all of them, all the cases have rejected. All the cases also say that a guarantee, which he gave, of a $30 million claim cannot be a commercial debt. That's why the FDCPA is so careful. It distinguishes between a commercial debt and a consumer debt. I'd also just like to point out that this court obviously can also dismiss this entire claim with prejudice on the basis of the fact that none of the defendants are debt collectors. It is clear from the Henson case, from the Ruddy case from the Second Circuit, and all the other cases, that if you are a creditor seeking to collect a debt that is owed to you, you cannot be a debt collector. So I'm going to end here in case unless you have any questions. Thank you. Good morning, Your Honors. May it please the court, Eric Wynick of Auditor PC on behalf of Kelly Torey Gamble. I'll try not to repeat anything that Mr. Geller said. I'll just touch on a few points. The first is the specific paragraphs in the complaint that bear on the issue of the 2006 transaction versus the 2011 transaction. And what hasn't been focused on is the jurisprudence that says we look at the purpose of the original transaction, which couldn't be clearer that it was commercial, not consumer. And if we look at the Miller v. McCullough case, we see exactly that. The analysis should be of the nature of the original transaction. Paragraphs 17 and 19 of the complaint talk about the plaintiff being a sophisticated business executive, the nature of the transaction being to obtain money to operate a gold mine. And Mr. Geller has already talked about the case law that a surety, personal surety of a business transaction does not equate to a consumer debt under the FDCPA. The other important point about the Miller case is that the act is intended, as we know, to protect consumers, not sophisticated business people. The complaint is rife in spelling that out that it's commercial, not consumer. The other important point, the New York judgment, the Russian judgment, was about the 2006 transaction. It was not about the 2011. Paragraph 94 of the complaint makes that crystal clear. And even if we were to examine the 2011 transaction with respect to the allegations against my client, Mr. Gambold, we see for the reasons that Judge Cronin pointed out that that doesn't pass muster as well, especially because the nearly $20 million that was received by the person saying he incurred a debt. And the surety, one last point, the case law makes clear, is an obligation. It's a contractual obligation. It's not a debt under the FDCPA. All right. Thank you. All right. Mr. Murphy. I have two points on rebuttal. The first goes to the case law. And we discussed, Your Honor, about the very broad language that was dictated in Goldman against Cohen about a rising under language. That language is too broad and doesn't actually come up within the context of Scarola-Nicolaides and Cohen versus Potenza. In each of those three cases that my colleague mentioned, those have to do with someone who takes business monies and then spends them for personal uses. So there's no other transaction other than the commercial transaction that arose out of those things. So there's no question about a second transaction that was a pro tanto exchange. I'm sorry to keep delaboring this, but I have to confess I still don't understand your theory as to how this admittedly commercial debt somehow was converted into something else. There are two key events. One event is 2006 that gave rise to the surety. The surety was for the receipt of $30 million from Gazprom Bank. That went in and was used for business purposes. We're not alleging that it was used for personal purposes. This is not Cohen. This is not Nicolaides. This is not Scarola. What we're saying is that later, for personal reasons, Mr. Pashuk was run out of Mongolia and he agreed to get payment along with certain conditions. And then by 2015, those conditions disappeared by the same individual that gave him the money. If it were not for the underlying initial commercial transaction, nobody here would be owed anything. That's correct, but there's actions outside of the surety. We have alleged for example— Why isn't the second transaction also commercial? If you're transferring corporate shares in GM from Pashuk to Phoenix Sino Limited, isn't that commercial as well? It has a commercial nature, but its primary purpose is personal. The idea behind it and the main motivation behind the parties entering the agreement was to get rid of the criminal charges against Pashuk personally. I mean almost any commercial transaction you can think of, you could conjure up a personal motive for it. I wanted to make money. I wanted to not lose money. I wanted to have fun, look good. Why would Gambold raise the surety, a surety that he assumed as a bonus, in 2015? Why would Gambold appoint his creature to purchase his own company's debt for $6 million from Gazprom Bank? The reason is clear. There's $2 billion sitting under the soil ready for easy division among the parties to the scheme. That's why. This is an unusual— Thank you very much. We'll reserve decision. Have a good day. Thank you, Your Honor. Thank you, Bob. Thank you all.